# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

AMERICAN CLOTHING EXPRESS, INC. D/B/A ALLURE BRIDALS AND JUSTIN ALEXANDER, INC.,

Plaintiffs,

vs.

CLOUDFLARE, INC. and DOES 1-200, INCLUSIVE.

Defendant.

Case No. _____

**COMPLAINT FOR DIRECT AND CONTRIBUTORY COPYRIGHT INFRINGEMENT**

[Demand for Jury Trial]

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

THE PARTIES........................................................................................................... 5

JURISDICTION AND VENUE ................................................................................ 7

I.   PLAINTIFFS' BUSINESSES AND INTELLECTUAL PROPERTY RIGHTS.................... 8

   a.   ALLURE BRIDALS................................................................................ 8

   b.   JUSTIN ALEXANDER........................................................................... 9

   c.   PLAINTIFFS' COPYRIGHTED IMAGES ..................................... 10

II.  THE ILLEGAL CONDUCT OF THE INFRINGING WEBSITES .................................... 11

III. CLOUDFLARE'S CONTENT DELIVERY NETWORK ................................................. 13

IV.  CLOUDFLARE PROVIDED SUBSTANTIAL ASSISTANCE TO THE INFRINGING
WEBSITES ............................................................................................................... 16

   a.   CLOUDFLARE CONCEALS THE IDENTITY OF THE COUNTERFEITERS ........... 16

   b.   CLOUDFLARE ENABLES THE INFRINGING IMAGES TO BE CACHED ON
   CLOUDFLARE'S DOMESTIC SERVERS AND TO BE STORED ON THE HARD DRIVES
   OF US CONSUMERS ......................................................................... 18

   c.   SPEED AND RELIABILITY ARE IMPERATIVE TO THE OPERATION OF THE
   FOREIGN INFRINGING WEBSITES SELLING COUNTERFEIT PRODUCTS................. 19

      i.   CloudFlare's Marketing Materials Tout That Speed Matters In E-Commerce, And That
      CloudFlare Makes Websites Operate Substantially Faster...................................... 19

      ii.  To Appear As Authentic Online Retailers, The Infringing Websites Must Operate As
      Quickly And Reliably As Genuine E-Commerce Websites.................................. 21

d.   CLOUDFLARE SIGNIFICANTLY IMPROVES THE SPEED AND RELIABILITY OF THE INFRINGING WEBSITES ........................................................................ 22

i.   The Reduced Latency Time. .......................................................... 23

ii.   CloudFlare's Other Performance Optimizations. ........................... 25

V.   PLAINTIFFS REPEATEDLY NOTIFIED CLOUDFLARE OF THE ONGOING INFRINGEMENT TO NO AVAIL ..................................................................... 27

LEGAL CLAIMS ...................................................................................... 29

FIRST CLAIM FOR RELIEF ..................................................................... 29

SECOND CLAIM FOR RELIEF .................................................................. 31

PRAYER FOR RELIEF .............................................................................. 33

JURY TRIAL DEMAND ............................................................................ 35

Plaintiffs American Clothing Express, Inc. d/b/a as Allure Bridals ("Allure,") and Justin Alexander, Inc. ("Justin Alexander," collectively with Allure, the "Plaintiffs"), by and through their counsel, hereby bring this Complaint against: i) the Defendant CloudFlare, Inc. ("CloudFlare") for contributory copyright infringement; and ii) DOES 1-200, referred to herein collectively as the "Infringing Website Defendants," for direct copyright infringement.

## **INTRODUCTION**

1.      Plaintiffs Allure and Justin Alexander are family operated businesses that have developed decades of goodwill through their design and manufacture of high quality wedding dresses. Plaintiffs invest hundreds of thousands of dollars per year on photoshoots of professional models wearing their dresses in studios and in exotic photoshoots located throughout the world.  Plaintiffs operate websites to display the images created during these photoshoots which constitute the Plaintiffs' primary marketing tool to the end consumer ("Plaintiffs' Images").

2.      The Defendant CloudFlare is a web performance and security company that provides a Content Delivery Network ("CDN"), web content optimization, website security, denial of service (DDos) protection, and a managed domain name system network ("DNS").  A CDN refers to a geographically distributed group of servers which work together to provide the fast delivery of Internet content.

3.      This case arises out of CloudFlare's aiding foreign infringers in their systematic infringement of Plaintiffs' Images (the "Infringing Website Defendants").  The Infringing Website Defendants have stolen the Plaintiffs' Images for the purpose of displaying them or slight alterations thereof (the "Infringing Images") on websites misleadingly designed to resemble authorized online retail internet stores purportedly selling Plaintiffs' authentic dresses ("Infringing Websites").

4.     Plaintiffs lack a meaningful remedy against the Infringing Website Defendants for the massive infringement willfully being perpetrated by them.  The vast majority of the Infringing Websites are hosted on servers located in the People's Republic of China, or in other foreign jurisdictions located in South East Asia, or on offshore servers that advertise their non-compliance with U.S. copyright laws.  Complaints sent by Plaintiffs, or their agents, to the Infringing Website Defendants, or to the entities hosting them in these far-away jurisdictions, largely fall on deaf ears.  Domestic judgments obtained against the Infringing Website Defendants are often unenforceable against them in their home jurisdictions.

5.     All of the Infringing Websites at issue in this action, during the relevant time periods, have been and/or are, optimized by CloudFlare's services to make the websites accessible to consumers in the United States, including within the State of Tennessee.

6.     As explained below, CloudFlare should be held liable for committing contributory copyright infringement, because CloudFlare: i) had knowledge of the direct infringement being perpetrated by the Infringing Website Defendants through CloudFlare's services and ii) CloudFlare materially contributed to that infringement.

7.     CloudFlare had actual knowledge of the specific infringing activity at issue here because anti-counterfeiting vendors retained by Plaintiffs delivered more than seven thousand notifications to CloudFlare of the ongoing infringement being prosecuted herein over the course of three years.  To combat this staggering campaign of infringement, Plaintiffs have retained vendors to use computer algorithms and other sophisticated techniques to locate the presence of the Plaintiffs' Infringing Images on unauthorized websites.  The Plaintiffs' notifications provided CloudFlare with hyperlinks to specific sales pages located on specific Infringing Websites on which the Infringing Website Defendants had displayed the Plaintiffs' Images.

8.     With the slightest of effort, Cloudflare could have confirmed the pattern of infringement being reported by Plaintiffs.  For example, as Plaintiffs never sell their wedding dresses online, the display of thousands of the Plaintiffs' Images on the Infringing Websites for the purpose of selling the dresses depicted therein at grossly discounted prices presents compelling evidence of the unauthorized use of the Plaintiffs' Images.  Some of the Infringing Websites at issue even blatantly used the Plaintiffs' trademarks, alongside the Plaintiffs' Images, to purport to offer to sell dozens of "Allure" or "Justin Alexander" dresses at discounted prices.  Some Infringing Websites display the same Infringing Images and content (such as the "About Us" and "FAQ" pages) that appeared on prior CloudFlare-optimized websites that had been shut down by Court order but now use a slightly different domain name, such as by changing a few letters.

9.     CloudFlare has materially contributed to the infringement because: i) CloudFlare's CDN service allows the Infringing Websites to create and store copies of the Infringing Images on CloudFlare's domestic servers; ii) CloudFlare's services significantly improve the speed and reliability of the Infringing Websites operated from far-flung jurisdictions; and iii) CloudFlare conceals the identity and IP address of the operators of the Infringing Websites.

10.    CloudFlare's CDN speeds a customer's access to a website by pulling static content files, and selected dynamic content, from the origin server into the distributed CDN network in a process called caching.  Once the data is cached, the CDN serves the content to the customer from the closest CDN data center instead of the origin server, which could be located thousands of miles away.  CloudFlare also provides other services which combine to significantly increase the speed with which websites hosted thousands of miles away can engage in e-commerce in the United States.

11.     In short, CloudFlare enables the Infringing Website Defendants to deliver their infringing website content rapidly and reliably to U.S. consumers from jurisdictions where they will be insulated from meaningful legal action being taken against them by Plaintiffs.

12.     CloudFlare could have stopped this infringement being perpetrated through its CDN by simply terminating the accounts of repeat infringers.  Instead, CloudFlare continued to provide the same services to the Infringing Websites with knowledge of their infringement to be able to maintain the revenue stream generated from the Infringing Website Defendants and other infringers using CloudFlare's services.

13.     CloudFlare has never terminated a repeat infringer in response to notifications sent by Plaintiffs or other bridal manufacturers.  The Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 512, provides a "safe harbor" to internet service providers, such as CloudFlare, who have adopted and reasonably implemented policies for the termination of subscribers of the service provider's system who are repeat infringers.  Instead, CloudFlare has responded to each notification with the statement that CloudFlare has passed on the DMCA report to the Infringing Website Defendant and to the company hosting the Infringing Website, even when the hoster is located in a foreign jurisdiction that does not require the hosting company to take any action in response to the receipt of the DMCA take-down notice.

14.     Thus, for example, some Infringing Website Defendants operated websites hosted by Blueangelhost.com, which is known for its advertisement of its offering of "non-DMCA compliant," "off-shore hosting."  Upon receiving a DMCA take-down notification for a website hosted by Blueangelhost, CloudFlare simply forwarded the Plaintiffs' DMCA report to Blueangelhost and to the Infringing Website Defendant knowing that the infringement would continue unabated.

4

15.     Consequently, an exceedingly disproportionate amount of websites infringing Plaintiffs' copyrights are optimized by CloudFlare, as opposed to other providers of CDNs, due to CloudFlare's well-known policy of refusing to terminate repeat infringers.  In sharp contrast, other CDN providers have responded to Plaintiffs' notifications of infringement by demanding that the infringing website immediately take down the infringing images from the origin server, or it would terminate the website's account if it did not comply.

16.     Accordingly, Plaintiffs are prosecuting claims against CloudFlare for contributory copyright infringement pertaining to more than 5,000 infringing images published on 99 different websites.

## THE PARTIES

17.     Allure is a Tennessee corporation which maintains its principal place of business at 3190 New Brunswick Road, Bartlett, Tennessee 38133. Allure is the owner of all right, title and interest in and to the seventeen registrations issued by the United States Copyright Office pertaining to models wearing Allure dresses ("Allure Copyrights").  Genuine and authentic copies of the U.S. federal copyright certificates for the Allure Copyrights are attached hereto as **Exhibit 1**.

18.     Justin Alexander is a New Jersey Corporation that maintains its principal place of business at 45 U.S. 46 #607, Pine Brook, New Jersey 07058.  Justin Alexander is the owner of all right, title and interest in and to the forty-four registrations issued by the United States Copyright Office pertaining to models wearing Justin Alexander dresses ("Justin Alexander Copyrights").  Genuine and authentic copies of the U.S. federal copyright certificates for the Justin Alexander Copyrights are attached hereto as **Exhibit 2**.

19.     Upon information and belief, Defendant CloudFlare, Inc. ("CloudFlare") is a Delaware corporation with its principal offices at 101 Townsend Street, San Francisco, CA 94107.

20.     Due to the nature of their infringing activities, the Infringing Website Defendants engage in various tactics to make it virtually impossible for Plaintiffs to learn their true identities, including by providing false and incomplete identifying information on their websites and in internet registries.   Upon information and belief, CloudFlare knows the true identity of the Infringing Website Defendants based upon CloudFlare's: i) contractual relationship with them; ii) provision of CDN services to them; iii) receipt of payments from them; and iv) the provision of technical support to their websites.   When Plaintiffs obtain additional credible information regarding the identity of the Infringing Website Defendants from CloudFlare or through the discovery process, Plaintiffs will seek to take steps to amend the Complaint to further identify certain Infringing Website Defendants.

21.     For the convenience of the Court, the Infringing Websites being prosecuted herein are identified in Schedule A to the Complaint.

22.     Additionally, as explained more fully below, Plaintiffs attach hereto the following:

 ➢ A listing of the number of DMCA notices sent by Plaintiffs' agents to CloudFlare, along with the number of distinct infringing URLs reported by Plaintiffs' agents for each domain (**Exhibit 3**); [1]

---

[1] "A uniform resource locator, or "URL," is an internet address which tells the browser where to find an internet resource… While it is possible to design a webpage so that all of the information contained on it is displayed on a screen or series of screens through which a user can progress without changing the URL of the webpage," it is often the case that "different webpages have different URL's." *Swapalease, Inc. v. Sublease Exch..com, Inc.*, No. 1:07-CV-45, 2009 U.S. Dist. LEXIS 5396, at *4 (S.D. Ohio Jan. 27, 2009) (internal citations omitted).   One URL might contain, for instance, multiple infringing images of the same dress.

➢ A listing of the dates of each notice sent by Plaintiffs' agents to CloudFlare along with the specific uniform resource locator ("URL") for the Infringing Image reported in each notice for each domain (**Exhibit 4**);

➢ For each domain, a side-by-side display of each of the Plaintiffs' copyrighted images with the corresponding Infringing Image that had been reported to CloudFlare, along with the copyright registration, URL and DMCA reporting information (**Exhibit 5**).

## JURISDICTION AND VENUE

23.     This is a civil action seeking damages and injunctive relief for copyright infringement under the copyright laws of the United States, 17 U.S.C. § 101, *et seq.*

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1338(a) (jurisdiction over copyright actions).

25.     This Court has personal jurisdiction over Cloudflare because: i) according to https://www.cloudflare.com/network/, Cloudflare maintains CDN servers in this judicial district in Memphis, Tennessee, and in this state in Nashville, Tennessee; ii) Cloudflare engages in systematic and continuous business in Tennessee and in this judicial district; and iii) Cloudflare materially aided the infringement targeting Allure, which is located within this judicial district.

26.     This Court has personal jurisdiction over the Infringing Website Defendants because they: i) conduct business throughout the United States, including within the State of Tennessee and this Judicial District, through the operation of fully interactive commercial websites and online marketplaces and ii) each Infringing Website Defendant targets the United States, including the State of Tennessee, and has offered to sell, and, on information and belief, has sold and continues to sell products to consumers within the United States, including the State of Tennessee, by infringing the Plaintiffs' copyrights.

27.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and/or 28 U.S.C. § 1400(a).  A substantial part of the acts of infringement complained of herein occurs or has occurred in this District, and Cloudflare may be found in this judicial district.

I.     **PLAINTIFFS' BUSINESSES AND INTELLECTUAL PROPERTY RIGHTS**

     **a.  ALLURE BRIDALS**

28.     Allure is one of the premier designers of wedding dresses, bridesmaid dresses and formal gowns.  Allure offers eight different bridal collections (*Allure Bridals*, *Allure Romance*, *Allure Couture*, *Madison James*, *Wilderly*, *Allure Women*, *Allure Modest*, *Allure Bridesmaids*), one special occasion collection (*Madison James*) and one menswear collection (*Allure Men*) that are sold in over one thousand retail stores in the United States, and in over three hundred stores internationally.

29.     Before designing dresses, Allure's founders, the Crum family, operated a fabric store in Bartlett, Tennessee and then opened a Bridal Salon under the same roof.  The Crums first offered a small unadvertised collection, called Exclusive Bridals, which was curated for the needs of local brides in Tennessee.  In 1997, Allure offered the *Allure Bridals* collection, which was advertised nationally.  In 2007, the Crums closed the bridal salon to focus fully on manufacturing.

30.     Allure presently operates two websites, Madison-James.com and Allurebridals.com, where it promotes genuine Allure products to consumers.

31.     Allure's gowns are known for their innovative designs and impeccable craftsmanship. Allure has procured a patent involving Allure's unique built-in-corset construction which helps the bride's dress stay in place while providing for a more flattering fit.

b.  **JUSTIN ALEXANDER**

32.     Justin Alexander has grown to be one of the largest manufacturers and wholesalers of bridal gowns and formal wear throughout the world.  Justin Alexander offers the marquee collection *Justin Alexander*, in addition to the noteworthy designs of *Justin Alexander Signature*, *Lillian West*, *Sincerity Bridal* and *Sweetheart Gowns*.

33.     Before starting Justin Alexander in the early 1990s, Larry Warshaw had worked in family-operated wedding veil and dress manufacturing companies since the 1970s.  The Warshaw family debuted on the bridal fashion scene as T&G Bridal in Brooklyn in 1946.  Justin Warshaw has succeeded Larry Warshaw as the President of Justin Alexander.

34.     Justin Alexander has become a contemporary designer and manufacturer of mid-to high-end bridal gowns and accessories.  Justin Alexander employs its own team of dress designers to enable Justin Alexander to manufacture unique bridal gowns and formalwear.  Justin Alexander invests significant sums of money in the development of designs that fit its own branding strategies.

35.     Presently, Justin Alexander products are sold in approximately 500 retail stores throughout the United States and an additional 900 retail stores throughout the world.

36.     Since around 2012, Justin Alexander has operated a website where it promotes genuine Justin Alexander products to consumers at justinalexander.com.  Justin Alexander uses its website to display its entire catalog of product and to refer brides to stores in their local markets.  None of Justin Alexander's wholesale partners engage in E-commerce. Therefore, counterfeit online retailers who unlawfully exploit their images and misrepresent themselves as authorized dealers present a major hindrance to Justin Alexander's retail and wholesale business.

### c. PLAINTIFFS' COPYRIGHTED IMAGES

37.     The Plaintiffs invest hundreds of thousands of dollars per year on photoshoots of their dresses.

38.     In the studio shoots, the Plaintiffs create multiple views of each dress, as worn by a fashion model, to be displayed to consumers on their websites.

39.     Plaintiffs also select unique locations for their photoshoots that help distinguish and elevate their brand such as the French Riviera, Santorini, Lanzarote in the Canary Islands, Iceland, a Wyoming Ranch or the Coast of Maine.

40.     Plaintiffs then review, retouch and color-correct hundreds of images before displaying them on their websites or distributing them to authorized retailers across the globe.

41.     Plaintiffs' websites serve to display their entire catalog of product, as shown in the Plaintiffs' Images, and to refer brides to stores in their local markets, as the Plaintiffs' wedding dresses are not available for sale online.

42.     Plaintiffs annually invest hundreds of thousands of dollars in advertising the Plaintiffs' Images.

43.     The Plaintiffs' Images also are displayed in catalogs distributed throughout the world to retailers and others.  The pictures used to advertise and market these gowns are the original works of the Plaintiffs and licensed to authorized distributors.

44.     The Plaintiffs' Images constitute an integral part of their brand identity.

45.     The aforementioned copyright registrations held by Allure and Justin Alexander, as identified in **Exhibits 1 and 2**, are valid, subsisting, unrevoked and uncancelled.

## II.      THE ILLEGAL CONDUCT OF THE INFRINGING WEBSITES

46.      The Plaintiffs have been victimized by a massive and unrelenting copyright infringement and counterfeiting scheme perpetrated by the Infringing Website Defendants who are exploiting the Plaintiffs' Images to sell cheap imitations of Plaintiffs' gowns through the internet.

47.      The Infringing Website Defendants infringe the Plaintiffs' Images for the purpose of knowingly and willfully manufacturing, importing, distributing, offering for sale, and selling grossly inferior "knock-offs" of the Plaintiffs' dresses which the Infringing Website Defendants pass off as the Plaintiffs' authentic dresses.

48.      The Infringing Websites prominently post the Infringing Images on the home page of the Infringing Websites and/or in galleries of dresses available for sale, along with providing a detailed product description to pose as authorized online retailers, outlet stores or wholesalers selling genuine Plaintiffs' products.

49.      For example, the website Davidsdress.com displays a gallery of images of Justin Alexander dresses available for sale at 82% off:



50.     The Infringing Websites purport to sell the Plaintiffs' dresses, as depicted in the Infringing Images and as described in the accompanying product descriptions, at grossly discounted prices.

51.     However, the Infringing Website Defendants do not sell genuine Plaintiffs' products. Instead, the Infringing Website Defendants send to unwitting consumers inferior and different dresses.

III.    **CLOUDFLARE'S CONTENT DELIVERY NETWORK**

52.    CloudFlare provides Content Delivery Network ("CDN"), domain nameserver ("DNS") and related security services to the Infringing Websites.

53.    According to www.CloudFlare.com, CloudFlare "provides a global content delivery network (CDN) with unique performance optimization capabilities."

54.    To improve speed and connectivity, "a CDN will place servers at the exchange points between different networks. These Internet exchange points (IXPs) are the primary locations where different Internet providers connect in order to provide each other access to traffic originating on their different networks. By having a connection to these high speed and highly interconnected locations, a CDN provider is able to reduce costs and transit times in high speed data delivery." See *www.CloudFlare.com/learning/cdn/what-is-a-cdn*.

55.    "A CDN improves the latency by pulling static content files from the origin server into the distributed CDN network in a process called caching.  Some CDNs will have advanced features that allow for the selective caching of dynamic content as well.  Once the data is cached, the CDN serves the content to the client from the closest CDN data center."    *See https://www.cloudflare.com/static/media/pdf/cloudflare-whitepaper-cdn.pdf*.[2]

56.    Caching servers are servers that temporarily cache or store content, in order to improve the time it takes for website content from the host server to reach the end users in a particular geographic area.  The more geographically distant an end user is from a server, the longer it takes

---

[2] "Static content" refers to content that normally does not change over time, such as images of Plaintiffs' products. "Dynamic content" refers to content that may change over time and is typically supplied from databases, such as prices and delivery times.

for content from that server to reach that end user.  A caching server that is located nearer to the end user than the host server shortens the physical distance that the host's content must travel, and therefore also shortens the time it takes for content to load in an end user's browser.

57.     CloudFlare claims that its global network of data centers across the globe "reduces latency and time to first byte by delivering content closer to visitors.  CloudFlare's size and distribution of interconnects offers fast, reliable content delivery throughout the world."     *See* *www.CloudFlare.com/learning/cdn/performance.*

58.     Cloudflare claims that its CDN network is powered by 180 data centers spanning across 80 countries, including in thirty nine (39) cities located in the United States, as illustrated below:



See *https://www.cloudflare.com/network*.

59.    In a whitepaper published by CloudFlare titled, "*CloudFlare CDN: A Global Content Delivery Network With Unique Performance Optimization Capabilities*," CloudFlare proclaims that:

> Our CDN is unique because it is a massive horizontally scaled architecture in which every node can perform DNS requests, security checks, and performance transformations.  Additionally, CloudFlare employs Anycast routing to ensure web users are automatically routed to their nearest data center and around any failures.  The combination of this architecture and networks produces a reliable, high-performance service.

*See www.CloudFlare.com/static/media/pdf/CloudFlare-whitepaper-cdn.pdf.*

60. CloudFlare further explains in this whitepaper that:

> CloudFlare is a zero configuration CDN.  As soon as you activate your site on CloudFlare, we cache your site's static content by default.  Our CDN caches more than 35 file extensions automatically, and allows users to write page rules to extend the list of file extensions we cache.
>
> CloudFlare serves site requests directly from cached content in whichever data center is physically closest to a site visitor, and because CloudFlare has data centers around the world, this means that whether you are in Chicago, Prague, Frankfurt or Singapore, web pages are delivered quickly, even when the origin server is thousands of miles away.  For example, a website might be hosted in the US, but accessed mainly by web visitors in the UK.  With CloudFlare, the site will be served from a UK data center eliminating costly delays.  CloudFlare's ability to make a web site appear to be close to web surfers is key to accelerating web surfing.
>
> In addition to faster load times, a website on CloudFlare sees 65% fewer requests to the origin yielding a 60% reduction in bandwidth consumption on your origin servers.
>
> By using CloudFlare's network, Big 5 Sporting Goods reduced their site's load time by approximately 100%.

*See www.CloudFlare.com/static/media/pdf/CloudFlare-whitepaper-cdn.pdf.*

IV.   **CLOUDFLARE PROVIDED SUBSTANTIAL ASSISTANCE TO THE INFRINGING WEBSITES**

 a.  **CLOUDFLARE CONCEALS THE IDENTITY OF THE COUNTERFEITERS**

61. CloudFlare requires clients to designate two CloudFlare nameservers as the authoritative nameservers for their website domain.  Nameservers convert the text-based Uniform Resource Locator of a website into a computer-readable address to point users and internet browsers in the direction of content stored elsewhere.

62. Upon the Infringing Websites designating CloudFlare nameservers for their websites, all requests for content from US consumers to the Infringing Websites are routed through CloudFlare's CDN.

63. After CloudFlare becomes the authoritative nameserver for an Infringing Website, CloudFlare uses a network technology called "Anycast" to cause Internet Service Providers (ISPs) to route initial domain name system (or DNS) lookups for that website domain to the CloudFlare data center closest to the visitor, as opposed to the host server for the Infringing Website.

64. Once an Infringing Website designates CloudFlare as the authoritative nameserver for a website, later requests for the Infringing Website generally pass through CloudFlare's network of data centers.  This function is known as "reverse proxying."  Without a service like CloudFlare, a user request for a URL though a browser would send a query to the domain name system and obtain the IP address for the host server of that Infringing Website, and route the request directly to that IP address (as opposed to routing it to the CloudFlare server).  For Infringing Websites that use CloudFlare, however, the initial DNS lookup for a URL returns the IP address of a CloudFlare data center.

65.    Due to the Infringing Websites designating the CloudFlare namerservers for their site, CloudFlare's name and IP appears for the Infringing Websites in an IP Address WHOIS lookup.

66.    Many of the owners and operators of the Infringing Websites utilize privacy services, or fictitious names, to mask their contact information on public WHOIS databases and domain registrars.

67.    Upon information and belief, CloudFlare knows the true identity of the Infringing Website Defendants who contract with CloudFlare to optimize their illegal websites

68.    Even upon receipt of multiple notifications from several copyright holders that an Infringing Website is posting infringing images, CloudFlare will not disclose the IP address of the Infringing Website or information identifying the operator of the Infringing Website.

69.    Instead, CloudFlare will simply forward the complaint to the operator of the Infringing Website (i.e., the Counterfeiter), and the hosting provider of the Infringing Website.  However, as the hosting providers of the Infringing Websites are often located in far-flung, non-DMCA compliant jurisdictions, the hosting providers almost always ignore the forwarded DMCA report.

70.    Consequently, the operators of the Infringing Websites flock to CloudFlare because: i) CloudFlare enables the Infringing Websites to operate quickly in the United States; while ii) the Infringing Website Defendants can remain anonymous and iii) insulated from meaningful legal action being taken against them in far-away jurisdictions.

**b. CLOUDFLARE ENABLES THE INFRINGING IMAGES TO BE CACHED ON CLOUDFLARE'S DOMESTIC SERVERS AND TO BE STORED ON THE HARD DRIVES OF US CONSUMERS**

71.     When a US consumer wants to visit an Infringing Website, the US consumer's ISP routes the traffic to a CloudFlare data center, which will provide certain static assets, such as product images, for the Infringing Website to the US consumer's computer from its own caching servers (if any such elements exist within CloudFlare's caching servers), and will deliver the remaining materials directly from the Infringing Website's host server to the US consumer's computer.

72.     CloudFlare's CDN takes static content, such as static image files in formats such as .jpg, and stores a copy of the static content closer to the visitors to the websites.

73.     CloudFlare's CDN creates and stores copies of the Infringing Images on CloudFlare's cache servers located within the United States.  The Infringing Images consist of .jpg static files lifted from the Plaintiffs' websites and then displayed on the Infringing Websites.

74.     CloudFlare's CDN allows US consumers to retrieve Infringing Images that originated on Infringing Websites faster and more efficiently than they could without CloudFlare's CDN.

75.     Through CloudFlare, the Infringing Websites are able to deliver to consumers in the United States identical copies of the Infringing Images as they appeared on the Infringing Websites.

76.     When a US consumer receives an Infringing Image through CloudFlare, the Infringing Image is displayed on the computer of the US consumer.

77.     When a US consumer receives an Infringing Image through CloudFlare, a copy of the Infringing Image then resides in the local storage of the computer or mobile device of the US consumer.

18

    **c.**  **SPEED AND RELIABILITY ARE IMPERATIVE TO THE OPERATION OF THE FOREIGN INFRINGING WEBSITES SELLING COUNTERFEIT PRODUCTS**

      **i.**  **CloudFlare's Marketing Materials Tout That Speed Matters In E-Commerce, And That CloudFlare Makes Websites Operate Substantially Faster**.

78.     In September 2009, Akamai Technologies, one of CloudFlare's main competitors, released findings from a commissioned study conducted by Forrester Consulting examining eCommerce web site performance and its correlation with an online shopper's behavior.[3]  As a result of the study, Akamai announced that "2 Seconds" was the "new threshold of acceptability for ecommerce web page response times." *Id.*

79.     Based upon the study, Akamai declared that "consumers become impatient when pages take longer than two seconds to load" and that when consumers are made to wait for a page to load, "14 percent will begin shopping at another site, and 23 percent will stop shopping or walk away from their computer." *Id*.

80.     In 2010, Google embraced Akamai's identification of "2 Seconds" as the acceptable threshold response time for ecommerce sites, and declared that Google aims "for under a half-second."  *https://webmasters.googleblog.com/2010/05/you-and-site-performance-sitting-in.html.*

81.     In February 2017, Google indicated that "53% of mobile site visits leave a page that takes longer than three seconds to load." *See  https://www.thinkwithgoogle.com/marketing-resources/data-measurement/mobile-page-speed-new-industry-benchmarks*.

---

[3]  See https://www.akamai.com/us/en/about/news/press/2009-press/akamai-reveals-2-seconds-as-the-new-threshold-of-acceptability-for-ecommerce-web-page-response-times.jsp.

82.    Likewise, CloudFlare's marketing materials emphasize the importance of the "speed" of a website to a company's ability to engage in e-commerce, and tout CloudFlare's superior ability to significantly improve website load-times.

83.    For example, CloudFlare asserts that "Consumers expect fast and reliable access to their online experiences" and that "Slow-loading internet applications result in degraded brand perception, reduced lifetime customer value, and near-term financial impact, such as lower revenues and higher operational costs."   *See www.CloudFlare.com/performance/accelerate-internet-applications.*

84.    CloudFlare explains that just "One Second Counts" in e-Commerce because:

> In today's digital age, customers, partners, and employees expect response times in a matter of a second or even milliseconds and have no tolerance for downtime. Slow online experiences result in lost revenues, dissatisfied customers, and diminished productivity, impacting companies of all shapes and sizes—B2C to B2B and small businesses to large enterprises across all industry segments.
>
> **High Latency**
>
> Speed matters, and it is measured in milliseconds. A study by Google found that 400 millisecond page-load times (.4 second) result in users conducting fewer web searches. It also uncovered that a 250-millisecond difference (.25 second) between your site and that of a competitor is enough to prompt customers to turn to the competitor's site instead. So, what's the ideal page response time? The same Google research reveals that the visual sensory memory processor in the human brain works in bursts of 100 milliseconds (.1 second).
>
> Research shows that abandonment rates increase as page response times go up. Forty percent of visitors expect pages to load in two seconds or less, with a one-second delay resulting in a seven percent reduction in conversions for e-commerce sites. What does this mean in terms of revenue? For an e-commerce site generating $100,000 in sales per day, this translates into $2.5 million in lost revenue annually.

20

*See www.CloudFlare.com/media/pdf/CloudFlare-whitepaper-load-balancing.pdf.*

85.    CloudFlare's marketing materials further emphasize the importance of website speed to the ability of a retailer to serve the growing population of mobile devices:

> To successfully capture this section of the market, businesses need to meet consumers' increasing expectations for mobile content speed. Mobile consumers demand instant gratification. According to a Gomez study, **75% of mobile users give up within 4 seconds of waiting for a mobile page to load.**

*See   https://www.CloudFlare.com/static/media/pdf/CloudFlare-mobile-brief.pdf*   (emphasis   in original).

86.    The speed of a website also impacts the ranking of the website when searches are conducted in Google and other search engines.  Additionally, a slow page speed means that search engines can crawl fewer pages of the site using their allocated crawl budget, which could negatively affect the indexing of the website in searches conducted in Google's search engine.

### ii.  To Appear As Authentic Online Retailers, The Infringing Websites Must Operate As Quickly And Reliably As Genuine E-Commerce Websites.

87.    The Infringing Websites must operate as quickly and seamlessly as genuine ecommerce websites to convince US consumers that they are shopping for wedding dresses at a genuine Online Store.

88.    To accomplish this deceit, the Infringing Websites must be able to simultaneously handle from across the globe:

> ➤  multiple consumers at a time repeatedly clicking on the hundreds if not thousands of images of dresses appearing on the sites while shopping; and

> ➤  responding promptly to consumer inquiries about prices, sizes and delivery terms.

21

89.     Additionally, the Infringing Websites must be consistently available to consumers who view the sites multiple times before purchasing.

90.     As discussed below, this is no easy feat for the Infringing Websites located in far-flung jurisdictions, absent the benefit of CloudFlare's services.

91.     In short, absent the benefit of CloudFlare's CDN, the websites would operate so slowly, if at all, that consumers visiting the Infringing Websites from the United States would give up and move to other websites.

92.     In other words, absent the ability to make the foreign Infringing Websites as fast and reliable as genuine websites, the infringement of the Plaintiffs' Images would be so pointless that the infringement would be greatly reduced, if it would occur at all.

### d. CLOUDFLARE SIGNIFICANTLY IMPROVES THE SPEED AND RELIABILITY OF THE INFRINGING WEBSITES

93.     CloudFlare improves the performance of the Infringing Websites by: a) reducing the physical distance between a customer and the requested data; b) improving the performance of server-side infrastructure, such as by using solid state hard drives and efficient load balancing; and c) employing techniques to reduce file sizes so that the initial page of a website loads quickly. *See www.CloudFlare.com/learning/cdn/performance.*  The combined impact of these optimizations provided by CloudFlare materially aids the Infringing Websites in displaying the Infringing Images in the United States.

### i. The Reduced Latency Time.

94.    CloudFlare's CDN significantly reduces the round-trip time (as defined in ¶ 95 below) between the host servers for the Infringing Sites, often located in South East Asia, and the consumers located in the United States.

95.    Round-Trip Time, or RTT, is defined as "the duration in milliseconds (ms) it takes for a network request to go from a starting point to a destination and back again to the starting point." *https://www.CloudFlare.com/learning/cdn/glossary/round-trip-time-rtt/*.

96.    CloudFlare's marketing materials use the example of how its CDN dramatically reduces the Round-trip Time for a user requesting information from a website hosted in Singapore, or nearly 10,000 miles away.  CloudFlare explains:

> If a server hosting website content (the origin server) is located in Singapore, each request for each webpage asset must travel from New York to Singapore and back again. Much like taking an international flight with many connections along the way, each request must travel through a series of routers along its distant travel from point A to point B….
>
> Because the request from New York to Singapore needs to pass through each of the router locations along the way, the amount of time (latency) is increased both by the total distance and the time it takes each router to process the request. Once the origin server processes the request and responds to the client making the request, it then sends information back through a similar sequence of routers before it returns to New York. The measurement of this total round trip is referred to in telecommunications as RTT for "round trip time."

97.    CloudFlare asserts that a site hosted in Singapore, with merely "5 unique assets consisting of images, JavaScript files and the webpage itself" can obtain a "nearly 2 second improvement in load time" for a website viewer in New York if the Singapore website uses a CDN in Atlanta that contains a cached copy of the static website.  *See CloudFlare.com/learning/cdn/performance*.

98.    Thus, in CloudFlare's learning example, the extremely simple webpage hosted in Singapore will take 3 seconds to load absent the benefit of a CDN, but with a CDN could load in 1.1 seconds or under (*Id.*).

99.    Even more telling, CloudFlare clarifies that "As websites become larger and require a greater number of assets, the latency between point A and B continues to increase."  *Id.*

100.    The Infringing Websites are far more complex than CloudFlare's hypothetical site hosted in Singapore.  Absent the use of a CDN, the Infringing Websites would operate too slowly to engage in e-commerce in the US due to their displaying of hundreds of images and their need to promptly respond to customer inquiries, such as about pricing.

101.    Given that CloudFlare has 37 server facilities within the continental US, and its CDN "reduces latency and time to first byte by delivering content closer to visitors" and "serves site requests directly from cached content in whichever data center is physically closest to a site visitor," it is reasonable to conclude that users who visit the Infringing Websites within the US are viewing at least some copies of Plaintiffs' Images on CloudFlare servers located within the US.

102.    CloudFlare's marketing materials cite to several "Case Studies" to demonstrate how CloudFlare dramatically improves the performance of websites transmitting data from South East Asia to the western hemisphere:

    a.    **Xian Jiatong-Liverpool University ("XJTLU")** –XJTLU is a joint partnership between Xi'an Jiatong University and the University of Liverpool.  According to CloudFlare, access to XJTLU's site was intermittent and slow for off campus users, and this "poor performance was magnified for international users trying to access the site from distant geographies."  CloudFlare boasts that based upon its partnership with Baidu, China's leading search engine, CloudFlare was able to "dramatically" reduce XJTLU's geographic latency and bandwidth costs.  CloudFlare touts that the deploying of its CDN procured the following key results for XJTLU: 59% increase in page views, 81% increase in users, 58% bandwidth savings and 65% increase in sessions.  *See CloudFlare.com/case-studies/xjtlu*.

24

b. **ChaseFuture** - CloudFlare enabled ChaseFuture, a Shanghai-based startup and platform for college and graduate school admissions, to provide students with a better online experience. "The number of trade-offs we've made to launch our platform to connect Chinese students with international educational opportunities was astounding," said Greg Nance, CEO and founder of Shanghai based ChaseFuture. "CloudFlare solved all of our problems. Our desktop and mobile apps are now blazing fast for our Chinese customers, as well as our international partners and mentors, even though all of our infrastructure is in China."

      **ii.**     **CloudFlare's Other Performance Optimizations.**

103.    CloudFlare's DNS service also speeds the delivery of content from the host servers of the Infringing Websites to domestic visitors to the Infringing Websites.  CloudFlare had represented that its "Managed, Anycast DNS" service can result in "dramatically" faster DNS lookup times:

> There are two potential issues with the DNS model described above. First, if you're using a single authoritative nameserver to store the DNS records for your web property, then there can be dramatic latency for those accessing that server due to a geographic distance. That is, if your server is located in the United States, and someone in Australia is trying to access your web property there can be a noticeable delay for them before any content is even loaded. Second, if your authoritative nameserver goes offline, then your web property can become entirely inaccessible, even if the property itself is still online.
>
> To solve this [sic.] issues, CloudFlare provides a managed Anycast DNS service.  CloudFlare works to make its Anycast DNS service as fast and reliable as possible.  By serving records from over 120 data centers around the world customers can see dramatic latency and reliability improvements.   Anycast technology allows CloudFlare's DNS to serve the same records from multiple locations and to route DNS inquiries to the nearest data center in order to ensure the lowest latency possible.   Therefore, a site using CloudFlare's DNS serves records from the same region as the originating request…

*See www.CloudFlare.com/dns.*

25

104.    Additionally, CloudFlare claims that the following features also significantly increase the speed of websites:

> **"Argo Smart Routing"** – CloudFlare claims that its "Argo Smart Routing reduces Internet latency on average by 35%; connection errors by 27%."  According to CloudFlare, "CloudFlare routes 10% of all HTTP/HTTPS Internet traffic providing Argo with real-time intelligence on the true speed of network paths. Argo's smart routing algorithm uses this information to route traffic across the fastest paths available, and maintains open, secure connections to eliminate latency imposed by connection setup. Argo's tiered caching technology uses regional tier 1 CloudFlare data centers to propagate content to CloudFlare's global network of 152+ Data Centers, minimizing requests to servers and reducing costs." *See www.CloudFlare.com/products/argo-smart-routing.*

> **"Load Balancing"** – "CloudFlare's Load Balancing automatically reduces latency by directing visitors to infrastructure closest to them: send European customers to the London datacenter, Australian customers to the Sydney datacenter, and anywhere in-between. Load Balancing builds on top of CloudFlare's Anycast network, allowing for quick delivery of static assets through CloudFlare's CDN, and reducing latency for dynamic requests by keeping visitors close to your infrastructure." *See www.CloudFlare.com/load-balancing.*

> **"Railgun Integration"** – "Railgun ensures that the connection between your servers and the CloudFlare network is as fast as possible. Railgun compresses previously uncacheable web objects up to 99.6% by leveraging techniques similar to those used in the compression of high quality video.  This results in an average 200% additional performance increase for anyone who hosts their CloudFlare enabled website on your server." *See www.cloudflare.com/partners/hosting-provider.*

> **"Web Content Optimization"** **–** According to CloudFlare, "Web performance is not just about moving static files closer to visitors, it's also about ensuring that every page renders as fast and efficiently as possible from whatever device a visitor is surfing from. CloudFlare users can choose any combination of these web content optimization features that take performance to the next level."   CloudFlare claims that just one of these optimizations, the "Rocket Loader" which "bundles JavaScript files" reduces the load time for the Financial Times website from 5 seconds to 2 seconds,

"in spite of them already using a top-tier CDN to deliver their content."

## V.   PLAINTIFFS REPEATEDLY NOTIFIED CLOUDFLARE OF THE ONGOING INFRINGEMENT TO NO AVAIL

105.   Plaintiffs have instituted an anti-counterfeiting program to combat the prolific infringement of the Plaintiffs' Images and the counterfeiting of their dresses.  Plaintiffs have retained multiple anti-counterfeiting vendors to use a combination of web crawlers, image detection technology, algorithms and analytics to identify infringing websites.

106.   The Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 512, provides a series of safe harbors that limit the copyright infringement liability of an Internet Service Provider ("ISP") and related entities.  However, for a party to avail itself of any of these safe harbors, the party must show that it meets the threshold requirement, common to all § 512 safe harbors, that it has "adopted and reasonably implemented… a policy that provides for the termination in appropriate circumstances of subscribers… who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

107.   The DMCA conditions the availability of the safe harbors upon the implementation of a repeat infringer policy because "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access." H.R. Rep. No. 105-551, pt. 2, at 61.

108.   Plaintiffs' anti-counterfeiting vendors have notified CloudFlare of thousands of repeated and blatant infringements of Plaintiffs' copyrighted images by CloudFlare's customers (i.e., the Infringing Websites and the Counterfeiters that operate them).

27

109.    Upon information and belief, other wedding and prom dress manufacturers have notified CloudFlare that the same counterfeiters are infringing their copyrights through the same foreign websites optimized through CloudFlare.

110.    Despite receiving thousands of notifications that the Infringing Website Defendants, and other similar counterfeit sites, were repeatedly and flagrantly infringing the copyrights belonging to Plaintiffs and other dress manufacturers, CloudFlare has continued to permit these repeat infringers to use CloudFlare's services to infringe Plaintiffs' copyrights without consequence.

111.    To show the Defendants' willful disregard of the infringement, the following are provided:

> ➢ A listing of the number of DMCA notices sent by Plaintiffs' agents to CloudFlare for each domain, along with the number of distinct URLs reported therein (**Exhibit 3**);

> ➢ A listing of the dates of each DMCA notice sent to CloudFlare along with the specific URL for the Infringing Image reported in each DMCA notice (**Exhibit 4**);

> ➢ A side by side display of the Plaintiffs' copyrighted image with each Infringing Image that had been reported to CloudFlare, along with the URL, Domain and DMCA reporting information (**Exhibit 5**).

112.    CloudFlare's policy evidently is to refuse to suspend, terminate or otherwise penalize customers that repeatedly commit copyright infringement through its network.  The Counterfeiters do not face any realistic threat of account termination even when CloudFlare has specific and actual knowledge of the Counterfeiters' repeated and blatant infringement.

113.    Instead, CloudFlare's sole response to the Plaintiffs' notifications of infringements is to pass on the DMCA-compliant complaint to the host of the infringing website and to the infringer itself.

114.    CloudFlare clearly has the capability to terminate services to copyright infringers for reasons such as violation of CloudFlare's abuse policies, or in the discretion of CloudFlare's leadership.

115.    CloudFlare's policy of refusing to terminate repeat infringers protects a large revenue stream that CloudFlare receives from the many repeat infringers who are its customers and who rely upon CloudFlare to make their infringing websites available in the United States.

116.    Additionally, CloudFlare frustrates Plaintiffs' efforts to investigate the infringement by blocking the access of the web crawlers used by Plaintiffs' anti-counterfeiting vendors to the Infringing Websites.  CloudFlare obviously is familiar with Plaintiffs' anti-counterfeiting vendors from the numerous DMCA complaints that CloudFlare receives from them.   Nevertheless, CloudFlare acts to block their web crawlers from accessing the Infringing Websites, or downloading Infringing Images from the Infringing Websites, as a purported security measure.


**LEGAL CLAIMS**
**FIRST CLAIM FOR RELIEF**

**DIRECT COPYRIGHT INFRINGEMENT – 17 U.S.C. § 101**
**AGAINST THE INFRINGING WEBSITES DEFENDANTS.**

117.    Plaintiffs repeat and reallege the foregoing allegations above as if fully set forth herein.

118.    At all relevant times, Plaintiff have been the producers and copyright owners of the original photographic images that appear on the Plaintiffs' websites; i.e., the Plaintiffs' Images.

119.    Under the Copyright Act, the Plaintiffs possess the exclusive rights to reproduce, distribute, display, market and license the Plaintiffs' Images.

120.    Without the permission or consent of the Plaintiffs, the Infringing Website Defendants have taken the Plaintiffs' Images from Plaintiffs' websites and then reproduced, distributed, displayed and marketed the Plaintiffs' Images on websites controlled by the Infringing Websites Defendants.

121.    The Infringing Websites Defendants have displayed either identical copies of the Copyrighted Images on their websites, or slightly modified (or photoshopped) copies of the Copyrighted Images on their websites (the "Infringing Images").  The slightly modified copies of the Plaintiffs' Images are strikingly and/or substantially similar to the actual Plaintiffs' Images.

122.    The Infringing Website Defendants' actions constitute infringement of Plaintiffs' copyrights and exclusive rights under the Copyright Act.

123.    The Infringing Website Defendants' foregoing acts of infringement were willful and intentional.

124.    Due to the Infringing Website Defendants' unlawful actions, the Plaintiffs have suffered, and will continue to suffer, substantial losses, including but not limited to damage to their business reputation and goodwill.

125.    As a result of the Infringing Website Defendants' infringement of Plaintiffs' copyrights and exclusive rights under the Copyright Act, Plaintiffs are entitled to either actual or statutory damages pursuant to 17 U.S.C. § 504(c), and to their attorneys' fees pursuant to 17 U.S.C. § 505.

126.    Upon information and belief, the Infringing Website Defendants' conduct is causing and will continue to cause Plaintiffs to suffer great and irreparable injury.  Such harm will continue

unless the Infringing Website Defendants are enjoined from such conduct by this Court.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiffs are entitled to injunctive relief prohibiting the Infringing Website Defendants from further infringing Plaintiffs' copyrights, and ordering the Infringing Website Defendants to destroy all copies of Plaintiffs' copyrighted works made in violation of Plaintiffs' exclusive rights under the Copyright Act.

**SECOND CLAIM FOR RELIEF**
**CONTRIBUTORY COPYRIGHT INFRINGEMENT**
**AGAINST CLOUDFLARE**

127.   Plaintiffs repeat and reallege the foregoing allegations above as if fully set forth herein.

128.   As set forth above, the Infringing Website Defendants engaged in a scheme to directly infringe Plaintiffs' copyrights by unlawfully displaying, distributing and marketing thousands of Plaintiffs' Images on the Infringing Websites.

129.   CloudFlare has materially and substantially assisted the direct infringement perpetrated by the Infringing Website Defendants because:

  i. CloudFlare's CDN service creates and stores copies of the Infringing Images on CloudFlare's servers located within the United States;

  ii.  CloudFlare's CDN, and other services, significantly improves the performance of the Infringing Websites, and enables the Infringing Websites to make their counterfeit e-commerce websites hosted in far-flung jurisdictions as easy to access and use as those that originate within the United States for consumers in the United States; and

  iii. CloudFlare's DNS service allows the operators of clusters of the Infringing Websites to conceal their identities.

130.    CloudFlare had actual knowledge of the specific acts of infringement alleged herein.

131.    CloudFlare engaged in willful blindness to the specific acts of infringement alleged herein.

132.    Through Plaintiffs' agents, Plaintiffs have repeatedly, over the course of years, provided CloudFlare with actual knowledge of the direct infringements occurring through its system due to the conduct of the Infringing Website Defendants.

133.    Through Plaintiffs' agents, Plaintiffs have repeatedly, over the course of years, provided CloudFlare with repeat notification that the same Infringing Website Defendants have persisted in displaying numerous Infringing Images.

134.    Despite having received numerous notifications of infringement perpetrated by the Infringing Website Defendants, CloudFlare has refused to take any meaningful action to abate the infringement.

135.    Instead, when receiving a notification of infringement pertaining to the Infringing Website Defendants, CloudFlare simply passes the notification to the Infringing Website and to the company which operates the servers which host the Infringing Website.   However, as the Infringing Websites are hosted in distant jurisdictions that do not comply with the takedown provisions contained in the Digital Millennium Copyright Act, the hosts of the Infringing Websites often take no action in response to CloudFlare's passing on the complaint of infringement.

136.    CloudFlare could have taken the simple measure of terminating its relationship with the Infringing Websites upon receiving actual knowledge of their ongoing infringement.

137.    Instead, CloudFlare allowed the Infringing Websites to continue to exploit CloudFlare's services to make their websites accessible to consumers in the United States.

138.   CloudFlare has not acted reasonably or in good faith in response to Plaintiffs' notices of infringement and repeat infringement.

139.   CloudFlare's acts of infringement have been willful, intentional and purposeful, in disregard of and indifference to Plaintiffs' rights.

140.   As a direct and proximate result of CloudFlare's contributory copyright infringement, Plaintiffs are entitled to either actual or statutory damages pursuant to 17 U.S.C. § 504(c), and to their attorneys' fees pursuant to 17 U.S.C. § 505.

141.   CloudFlare's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to injunctive relief prohibiting further contributory infringements of Plaintiffs' copyrights.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against the Defendants as follows:

A.   All actual, compensatory, liquidated and/or statutory damages suffered by Plaintiffs with respect to each and every cause of action asserted herein;

B.   All immediate, temporary, preliminary and permanent injunctive relief to which Plaintiffs are otherwise entitled to as a matter of law and equity;

C.   All costs, expenses, and attorneys' fees incurred by Plaintiffs in investigating, readying, bringing and prosecuting each and every cause of action asserted herein; and

D.   Any additional relief the Court deems warranted under the circumstances.

34

<u>**JURY TRIAL DEMAND**</u>

Pursuant to Fed. R. Civ. P. Rule 38, Plaintiffs hereby demand a trial by jury.

Dated: January 6, 2020
      Memphis, Tennessee

                                  Respectfully submitted,


                                By: <u>/s/ Nicole Berkowitz</u>
                                    Grady Garrison (TN #8097)
                                    Nicole Berkowitz (TN #35046)
                                    Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
                                    165 Madison Avenue, Suite 2000
                                    Memphis, Tennessee 38103
                                    (901) 526-2000 (Telephone)
                                    (901) 577-2303
                                    ggarrison@bakerdonelson.com
                                    nberkowitz@bakerdonelson.com


                                    Russell Bogart (NY #2856078) (motion to appear *pro hac vice* forthcoming)
                                    rbogart@kagencaspersen.com
                                    Kagen & Caspersen, PLLC
                                    757 Third Avenue, 20th Floor
                                    New York, New York 10017
                                    (212) 880-2045
                                    (646) 304-7879


                                    *Attorneys for Plaintiffs*
                                    *American Clothing Express, Inc.*
                                    *d/b/a Allure Bridals and*
                                    *Justin Alexander, Inc.*