IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| AMERICAN CLOTHING EXPRESS, INC. d/b/a ALLURE BRIDALS and JUSTIN ALEXANDER, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CLOUDFLARE, INC. and DOES 1-200, inclusive, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 2:20-cv-02007-SHM-atc |

**ORDER AWARDING DAMAGES**

Before the Court is Plaintiffs' Brief on Damages and supporting evidence. (ECF Nos. 197–204; 207–208.) Defendant Imerle has not responded. For the reasons that follow, the Court awards Plaintiffs actual damages to include a reasonable license fee of $8,535,960.00, investigative and monitoring costs, and prejudgment interest.

**I.   Background**

On January 6, 2020, Plaintiffs American Clothing Express, Inc., doing business as Allure Bridals, and Justin Alexander, Inc. filed this action pursuant to the Copyright Act, 17 U.S.C. §§ 101, et seq., against Cloudflare, Inc. and the then-unknown operators of dozens of websites selling knockoff versions of

Plaintiffs' wedding dresses using Plaintiffs' copyrighted images of their dresses. (ECF No. 1.)

Although the identities of the operators were initially unknown, Plaintiffs were able to obtain the operators' contact information from defendant Cloudflare and received permission from the Court to serve the Doe defendants by electronic mail. (See ECF Nos. 23-24, 42, 52.) The clerk entered default against 94 of the Doe defendants in 2021, and the Court granted Plaintiffs' Motion for Default Judgment as to liability against those 94 Doe defendants in January 2022. (See ECF Nos. 62, 66, 87.)

Plaintiffs were able to identify the entity Imerle Limited (HK) ("Imerle") as the operator of many of the infringing websites, and Plaintiffs filed amended complaints. (See ECF Nos. 155 ¶¶ 11, 143-50; 165.) Pursuant to stipulations of dismissal, Imerle is the only remaining Defendant in this case. (See ECF Nos. 103-04, 170-71, 185 at 2.)

After the initial default, Imerle was granted permission to enter the case and was joined as a necessary party. (See ECF No. 157.) Imerle then sought to set aside the Court's entry of default judgment as to liability. (ECF No. 174.) The Court denied Imerle's motion, concluding there was a lack of good cause to set aside the judgment as to liability. (See ECF No. 184.)

2

The parties then asked the Court to resolve a dispute about the proper procedure to determine the amount of damages to which Plaintiffs are entitled. (See ECF No. 185.) Imerle asserted that it was entitled to post-default discovery and a jury trial on the sole remaining issue of damages. (Id. at 7–10.) Plaintiffs argued that Imerle had no post-default right to a jury trial, and that neither post-default discovery nor a jury trial was necessary to determine the appropriate amount of damages in this case accurately. (Id. at 4–7.) The Court ordered additional briefing on the issue. (See ECF Nos. 187–192.)

Before the Court could rule on the parties' dispute about the proper procedure to determine the amount of damages, counsel for Imerle sought to withdraw from their representation for "professional reasons." (ECF Nos. 193; 193-1.) On March 6, 2025, the United States Magistrate Judge granted Imerle's counsel's Motion to Withdraw, ordered Imerle to retain new counsel, and ordered that successor counsel appear by April 7, 2025. (ECF No. 194.) Imerle has failed to comply with the Magistrate Judge's Order.

On April 17, 2025, the Court entered an Order Resolving the Parties' Joint Motion on Damages Procedure. (ECF No. 196.) The Court decided that Imerle's default extinguished any right to a jury trial, declined to exercise its discretion to order a jury trial, and reserved ruling on whether the circumstances of the

3

case require a hearing on the issue of damages pursuant to Federal Rule of Civil Procedure 55(b)(2). (See id.)

The Court ordered Plaintiffs to submit a brief and evidence supporting their damages claims within 30 days, and gave Imerle 30 days to respond to Plaintiffs' brief and evidence, assuming Imerle retained new counsel who made a timely appearance.

Plaintiffs filed their brief and supporting evidence on May 19 and 20, 2025. (See ECF Nos. 197-207.) On May 28, 2025, Plaintiffs filed a supplemental expert report clarifying the apportionment of damages to each plaintiff. (ECF No. 208.)

Imerle remains in violation of the March 6, 2025 order requiring it to obtain new counsel and for new counsel to enter a notice of appearance. Therefore, Imerle has not responded to Plaintiffs' damages brief and supporting evidence.

**II.  Law and Analysis**

When a defendant has defaulted and the plaintiff's claim is not "for a sum certain or a sum that can be made certain by computation," the Court must determine the amount of damages to which the plaintiff is entitled. Fed. R. Civ. P. 55(b). Because a defaulted defendant admits only the defendant's liability, any amount of non-liquidated damages "must be proved." See Antuine v. Atlas Turner, Inc., 66 F.3d 105 at 110 (6th Cir. 1995). Federal Rule of Civil Procedure 55 provides that the Court "may

4

conduct hearings or make referrals" when it needs to determine the amount of damages to enter or effectuate judgment.

A court need only hold a hearing addressing damages if it cannot otherwise "ascertain the amount of damages with reasonable certainty." Vesligaj v. Peterson, 331 F. App'x 351, 355 (6th Cir. 2009) (quoting Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)).

Here, Plaintiffs have filed thousands of pages supporting their damages claim, including a detailed expert report, images of the infringing uses, and declarations explaining the evidence, evidence-gathering processes, and analysis. (See ECF Nos. 197–204, 207–208.) Because the Court can "ascertain the amount of damages with reasonable certainty," a hearing on damages is not necessary. See Vesligaj, 331 F. App'x at 355.

### A. Damages for Copyright Infringement

The Copyright Act provides that a copyright infringer is liable for either: "(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or (2) statutory damages, as provided by subsection (c)." 17 U.S.C. § 504(a).

A Copyright Act plaintiff is empowered to "elect, at any time before final judgment," an award of statutory damages. § 504(c)(1). Absent that election, a plaintiff must prove its

5

actual damages by a preponderance of the evidence. See Smith v. Thomas, 911 F.3d 378, 382 (6th Cir. 2018).

Here, Plaintiffs seek actual damages for Imerle's willful infringement, which include: $4,267,980.00 to $8,535,960.00 for a reasonable license fee, $662,153.49 in investigative and monitoring costs, and prejudgment interest.

### 1. Reasonable License Fee

The Sixth Circuit has joined the Second Circuit in upholding actual damages based on a hypothetical license fee, or the "reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer." Thoroughbred Software Int'l, Inc. v. Dice Corp., 488 F.3d 352, 359 (6th Cir. 2007) (citing Davis v. Gap, Inc., 246 F.3d 152, 167 (2d Cir. 2001)). A hypothetical reasonable license fee may include an adjustment for factors like the scarcity of the image or competitive usage. See, e.g., D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc., 111 F.4th 125, 140 (1st Cir. 2024); Under a Foot Plant, Co. v. Exterior Design, Inc., No. CV BPG-15-871, 2017 WL 3593014, at *5–6 (D. Md. Aug. 21, 2017).

Plaintiffs have retained Professor Jeffrey Sedlik of the Art Center College of Design, an expert in photography licensing, to opine on the value of a hypothetical license fee for Imerle's use of Plaintiffs' copyrighted images. (ECF No. 197 at PageID

6

16671.) Professor Sedlik has decades of experience in the photography industry and has served in high-level positions in trade associations and standard-setting bodies considering issues of licensing and copyright. See ECF No. 198 at 2-6.)

Plaintiffs have also retained Daniel Dwoskin, a Manager at Elysium Digital, LLC ("Elysium"), to provide technical consulting services and prepare the data about Imerle's website domains' infringing use on which Professor Sedlik's expert report relies. (See ECF No. 202.)

Plaintiffs' data collection strategy was conservative and "enforced a limitation that if one of Plaintiffs' images was detected on a domain, that it would only be claimed once per domain per each of [] five Usage Types.[1] In practice, there are almost certainly more usages than that." (Id. at 15.) Plaintiffs did not count instances when an image was used multiple times with different product names or additional uses in "Related Products", "Top Deals", or "New Arrivals" sections because those uses were "uncertain and highly variable." (Id. at 15-19.) Plaintiffs' infringement timeline employs a similarly conservative methodology. (See id. at 23.)

---

[1] Plaintiffs' technical consultant determined that Plaintiffs' images appeared in at least five locations when they appeared on Defendant's websites: Thumbnail—Gallery, Thumbnail—Product, Main Product, Enlarged, and Full Size. (ECF No. 202 at 9-14.)

7

Professor Sedlik also employed a conservative methodology. He first calculated a baseline hypothetical license fee of $853,596.00 based on consolidating Imerle's 2,050 infringing usages into a hypothetical sale of 410 unique licenses at market rates. (See ECF No. 198 at PageID 16725-28.) The average baseline market rate of $1,086.00 for a one-year license was "obtained from reasonable non-speculative market sources, without consideration of the specific identities of the parties, without consideration of additional damage suffered (or to be suffered) by Plaintiffs, and without consideration of Defendant's competitive use of the Images." (Id. at 16728, 17193-215.)

Because Imerle's use of the images would have been "a scenario in which an image licensor is approached by a direct competitor seeking to purchase licenses to make competing use of the licensor's images," Sedlik opines that the actual hypothetical license fee, adjusted for competitive use, would be five to ten times the amount of the baseline hypothetical license fee: $4,267,980.00 to $8,535,960.00.[2] (Id. at 16729.)

---

[2] Sedlik's Supplemental Report apportions the hypothetical license fees between the Plaintiffs as follows:

| Plaintiff | Baseline Fee | 5x Competitive Use | 10x Competitive Use |
|---|---|---|---|
| Allure Bridals | $749,340.00 | $3,746,700.00 | $7,493,400.00 |
| Justin Alexander | $104,256.00 | $521,280.00 | $1,042,560.00 |

(ECF No. 208-1 at PageID 19945.)

8

After considering the record as a whole and specifically considering Plaintiffs' briefing, exhibits, the Dwoskin declarations, and Professor Sedlik's expert report, as supplemented, the Court finds that Plaintiffs should be awarded a reasonable license fee for competitive usage in the amount of $8,535,960.00. See Vesligaj, 331 F. App'x at 355; Thoroughbred Software Int'l, Inc., 488 F.3d at 359. (ECF Nos. 197–204, 207–08.)

As Sedlik notes, the result of his conservative estimates is that the actual amount of Plaintiffs' damages is "likely significantly greater" than $8,535,960.00, but that is the only amount the Court can determine with reasonable certainty. (See ECF No. 198 at PageID 16730–31.)

### 2. Investigative and Monitoring Costs

In addition to a hypothetical license fee, some courts have awarded pre-suit investigative costs and infringement monitoring costs as part of a plaintiff's actual damages. See Millennium TGA, Inc. v. Leon, No. 12-CV-01360 MKB, 2013 WL 5719079, at *14 (E.D.N.Y. Oct. 18, 2013) (collecting cases and noting that "Courts are divided on whether to award investigative costs incurred in connection with copyright infringement, and there is no clear guidance on whether investigative costs may be considered as a component of 'actual damages.'"). Courts have awarded those costs as part of a plaintiff's actual damages to

deter infringement and further the Copyright Act's purpose when the work of the investigators was "critical not only in identifying the various sites used to distribute the infringing materials...but also to providing corroboration for the determination of plaintiff's actual damages." Id. at *15. In awarding such damages, courts have been careful to award only the reasonable costs that are attributable to the infringing defendant. See id. at 16.

Here, Plaintiffs seek $375,910.00 paid to Incopro, Inc. ("Incopro") "to provide online brand protection services from the Spring of 2018 to the present," and $286,242.50 paid to Elysium "to investigate and verify the thousands of infringements and their reporting to Cloudflare by multiple anti-counterfeiting vendors." (ECF No. 197 at PageID 16676.)

Plaintiffs' claim for $286,242.50 paid to Elysium is supported by Dwoskin's second declaration, which states that this amount is "directly attributable to work involving the collection, identification, and analysis of infringement data, and the generation of exhibits and other demonstratives related to the infringement by websites operated by Imerle identified in the Complaint." (ECF No. 203 at 4.)

Plaintiffs' claim for $375,910.99 paid to Incopro is supported by the declarations of the Chief Financial Officer of Allure Bridals and the Controller of Justin Alexander. (See ECF

10

Nos. 197 at PageID 16676; 199–200.) Unlike Dwoskin's declaration, these declarations do not represent that Incopro's work exclusively addressed Imerle's infringement. Plaintiffs represent that Incopro provided "online brand protection services from the Spring of 2018 to the present," and "used data analysts and proprietary image searching software to detect Plaintiffs' copyrighted images across multiple online platforms." (ECF No. 197 at PageID 16676.) Plaintiffs argue that these costs "should be compensable because Imerle's Whac-a-Mole strategy forced Plaintiffs to incur them." (Id. at 16677.)

Although Incopro's work did not exclusively address Imerle's infringement, it was "critical not only in identifying the various sites used to distribute the infringing materials...but also to providing corroboration for the determination of [Plaintiffs'] damages." See Millennium TGA, 2013 WL 5719079, at *15.

In Millennium TGA, the court awarded the plaintiff 50 percent of the fees paid to locate and remove infringing content online when that defendant "was not [the company's] sole target, but was 'a very high-value target.'" See id. at *13–16. The situation here, with Imerle and Incopro's work, is analogous. Because Incopro's services were critical in identifying the infringing websites and determining damages, but did not exclusively address the harm Imerle caused, the Court awards

11

Plaintiffs $187,955.50, or 50 percent of the fees they paid for Incopro's services. Plaintiffs are awarded $286,242.50 for Elysium's work in identifying and helping determine the damages for Imerle's infringement. See id. at *15. (ECF No. 203 at 4.)

### 3. Prejudgment Interest

Courts may also award prejudgment interest in cases brought under the Copyright Act. See Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC, No. 2:18-CV-735, 2023 WL 2664411, at *3 (S.D. Ohio Mar. 28, 2023), appeal dismissed, No. 23-3427, 2023 WL 5151516 (6th Cir. Aug. 3, 2023), and aff'd, 93 F.4th 985 (6th Cir. 2024) (Noting that "a majority of federal circuits have found such awards permissible."). The Sixth Circuit has noted that the Copyright Act itself is silent on awards of prejudgment interest. See Robert R. Jones Assocs., Inc. v. Nino Homes, 858 F.2d 274, 282 (6th Cir. 1988). Courts may award prejudgment interest when doing so "would further the congressional purposes underlying the obligations imposed by the statute in question." Id. at 282 (quoting Bricklayers' Pension Trust Fund v. Taiariol, 671 F.2d 988 (6th Cir. 1982)). The purpose of the Copyright Act is to "deter unauthorized exploitation of someone else's creative expressions." Id. District courts in the Sixth Circuit, guided by Jones, have awarded prejudgment interest in Copyright Act cases. See, e.g., Premier Dealer Servs., 2023 WL 2664411, at *3;

12

Goldman v. Healthcare Mgmt. Sys., Inc., 559 F. Supp. 2d 853, 865 (W.D. Mich. 2008).

In awarding prejudgment interest, pursuant to 28 U.S.C. § 1961, courts use the rate "equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment" and generally compounded annually. Umfress v. City of Memphis, No. 2:17-cv-02568-SHL-tmp, 2020 WL 12969188, at *2 (W.D. Tenn. Oct. 19, 2020). The average 1-year constant maturity Treasury yield for the week ending June 27, 2025, is 3.98 percent.[3] Having been awarded $8,535,960.00 in reasonable licensing fees, $187,955.50 for Incopro's services, and $286,242.50 for Elysium's services, Plaintiffs should be awarded $1,725,626.86 in prejudgment interest.[4]

---

[3] See Market Yield on U.S. Treasury Securities at 1-Year Constant Maturity, Quoted on an Investment Basis (WGS1YR), Fed. Rsrv. Bank of St. Louis FRED, https://fred.stlouisfed.org/series/WGS1YR (last visited July 2, 2025); Selected Interest Rates (Daily) - H.15, Fed. Resrv. Bd. of Governors (July 1, 2025) https://www.federalreserve.gov/releases/h15/ (last visited July 2, 2025).

[4]

| Dates | Days | Principal | Interest |
|---|---|---|---|
| 1/6/2020 - 1/5/2021 | 365 | $9,010,158.00 | $358,604.29 |
| 1/6/2021 - 1/5/2022 | 365 | $9,368,762.28 | $372,876.74 |
| 1/6/2022 - 1/5/2023 | 365 | $9,741,639.02 | $387,717.23 |
| 1/6/2023 - 1/5/2024 | 365 | $10,129,356.26 | $403,148.38 |
| 1/6/2025 - 7/2/2025 | 177 | $10,532,504.63 | $203,280.23 |
| Total Prejudgment Interest | | | $1,725,626.86 |
| Total Judgment | | $10,735,784.86 | |

13

## III. Conclusion

The Court has granted Plaintiffs' Motion for Default Judgment as to liability. The Court's Order Granting Default Judgment reserved the issue of damages. (See ECF No. 87.)

Plaintiffs are entitled to $10,735,784.86 in actual damages from Imerle Limited (HK) as a result of Imerle's willful infringement of Plaintiffs' copyrighted images. Actual damages are allocated between Plaintiffs as follows: Allure Bridals is entitled to $9,207,670.58 and Justin Alexander is entitled to $1,528,114.28.[5] For which let judgment enter.

SO ORDERED this _2d_ day of July, 2025.

/s/ *Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

---

[5] The Court allocates damages according to Professor Sedlik's supplemental materials (ECF No. 208-1), 50 percent of the payments to Incopro described in the declarations filed by Plaintiffs' finance and accounting officers (ECF Nos. 199–200), an equal division of Elysium's costs (ECF No. 202–203), and the award of prejudgment interest at a rate of 3.98 percent.